UNITED STATES DISTRICT COURT                    <u>FOR ONLINE PUBLICATION ONLY</u>
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------- X
                                                    :
RICHARD TIMMONS,                                    :
                                                    :
                                  *Petitioner,*     :
                                                    :              MEMORANDUM
                 - against -                        :              <u>AND ORDER</u>
                                                    :              10-CV-1155 (JG)
WILLIAM A. LEE and ANDREW CUOMO,                    :
                                                    :
                                                    :
                                  *Respondents.*    :
----------------------------------------------------------------- X
A P P E A R A N C E S :

          RICHARD TIMMONS
          #97-A-5810
          Green Haven Correctional Facility
          P.O. Box 4000
          Stormville, New York 12582
          *Petitioner, pro se*

          RICHARD A. BROWN
          Queens County District Attorney
          125-01 Queens Boulevard
          Kew Gardens, New York 11415
          By:    Merri Turk Lasky
          *Attorney for Respondents*

JOHN GLEESON, United States District Judge:

          Richard Timmons petitions for a writ of habeas corpus pursuant to 28 U.S.C. §

2254.  Timmons challenges his March 2000 conviction in New York State Supreme Court,

Queens County of three counts of first-degree murder and one count of aggravated criminal

contempt.  Appearing *pro se*, Timmons seeks habeas relief on several grounds, discussed below.

Oral argument was heard on September 16, 2010, and for the reasons set forth below, Timmons's

petition is denied in its entirety.

BACKGROUND

A.      *The Offense Conduct*

On the evening of June 8, 1997, after a series of domestic disputes with his wife, Anita, Timmons murdered Anita, their seven-year-old son, Aaron, and Anita's thirteen-year-old son, Sharone, at their apartment in Queens by stabbing each of them repeatedly and beheading them. Police seized Timmons at the crime scene early the next morning.

B.      *Procedural History*

1.      *The Trial Court Proceedings*

a.      *The* Mapp/Huntley *Hearing*

On October 28 and November 2 and 10, 1998, Justice Robert Hanophy held a *Mapp/Huntley* hearing[1] to determine whether the physical evidence seized by the police from Timmons's apartment and Elmhurst Hospital and Timmons's statements should be suppressed.

At the hearing, New York Police Department ("NYPD") Detective Robert Ledee testified. Ledee testified that he responded to an apartment in Queens at approximately 1:00 a.m. on June 9, 1997. After observing Timmons on a stretcher in an ambulance with his hands bandaged, Ledee went up to apartment 6A, where he observed that the lock to the door was broken. Police Officer Labella, who was outside the apartment, told him that he had responded to a call of an assault in progress. Labella told Ledee that he had knocked on the door but had gotten no response, despite hearing noise in the apartment. The Emergency Services Unit eventually arrived and forced open the door. Labella told Ledee that when he entered the apartment, he found bodies and Timmons, who was bleeding.

---

[1]      A *Mapp* hearing tests the constitutionality of the seizure of physical evidence, *see Mapp v. Ohio*, 367 U.S. 643 (1961), while a *Huntley* hearing tests the voluntariness of a defendant's post-arrest statements, *see People v. Huntley*, 15 N.Y.2d 72 (1965).

Detective Dennis Bardin testified that he was assigned to investigate the homicide of a woman and her two children and was dispatched along with his partner, Detective Mary Ann Herbert, to Elmhurst General Hospital at approximately 1:20 a.m. on June 9. Bardin's task was to interview the father of the murdered children, who was being treated for some injuries. The father was Timmons, and Bardin was told by doctors that Timmons had been medicated and was not likely to die. Timmons's wrists were bandaged and bloody, and there was a cut on his head. Timmons was conscious the entire time Bardin was in the room. He was handcuffed to the bed and each foot was restrained with cloth restraints. Timmons would shout periodically for no apparent reason.

Bardin first asked Timmons what happened to him and his family, to which Timmons responded, "Mr. Cheeks." Timmons also referred to "Lost Boys." After learning additional information from detectives at the crime scene, Bardin advised Timmons of his *Miranda* rights at approximately 2:30 a.m., and Timmons waived them. Timmons appeared lucid, although he smelled of alcohol. He told Bardin that he and Mr. Cheeks had fought by the elevator in the hallway outside his apartment and that Mr. Cheeks had killed his family. He said his own injuries were self-inflicted because "he wanted to die." Bardin also showed Timmons Polaroid photographs of his family at the crime scene. Timmons identified the children by their name and age and stated that because it was Sunday, the children had not been at school that day. When Bardin showed Timmons a photograph of Anita's body from the crime scene, Timmons said, "stop bothering me." Bardin ceased his questioning of Timmons at approximately 6:30 a.m. At no point during his conversation with Bardin did Timmons admit any involvement in the murder of his family.

Detective Sam Gilford testified that he arrived at the crime scene at approximately 2:00 a.m., and proceeded to Elmhurst General Hospital shortly after.  He photographed Timmons and took twelve blood samples from him.  In addition, Gilford took Timmons's blue gym shorts and sneakers.

Detective Richard Mecabe went with his partner, Detective Sica, to Elmhurst General Hospital on June 9, 1997 to take Timmons into custody.  Mecabe took Timmons to an interview room at the 114th Precinct after being informed by Sica that Timmons was being discharged from the hospital.  Mecabe read Timmons his *Miranda* rights, which he once again waived.  At Timmons's request, the officers gave him food.  Mecabe testified that Timmons was in fine physical condition except for his wrist injuries, and he was alert and conscious throughout the interview.  Timmons told Mecabe and Sica that when he was coming back to the apartment, Cheeks was coming out, and they got into a physical altercation.  After the fight concluded, Timmons went back into the apartment and his wife and children were already dead.  Timmons stated he got some vodka and went into the bedroom.  At that point, Timmons said he called his mother and the next thing he knew, the police were in the apartment.  Timmons provided further information on Cheeks to Mecabe, who told him he was having a hard time believing Timmons's story.  Mecabe then played the 911 tape for Timmons three times.  On the 911 call, a child's voice can be heard in the background screaming, "Daddy, stop it; Daddy, stop it," along with the sound of blows being struck.  Timmons began to cry during the final playing of the tape and told Mecabe that he had killed his wife.

After Timmons's initial confession, Detective Ledee entered the room at about 3:00 p.m.  Once again, Timmons waived his *Miranda* rights, and he spoke to Ledee for ten to fifteen minutes.  He admitted to hitting his wife with an axe.  Timmons then wrote out a

statement. About an hour later, Ledee spoke to Timmons again for another thirty to forty minutes. Timmons dictated a statement to Ledee; he did not want to write it himself because his hand was hurting. In the statement, Timmons admitted to hitting his wife with an axe.

In support of his motion, Timmons called Dr. Ian Newmark to testify at the *Mapp/Huntley* hearing, which continued on January 21, 1999. Newmark testified that Timmons had lost a significant amount of blood— as much as 25% of his total blood volume—and had experienced a very significant drop in blood pressure. Newmark testified that this amount of blood loss could impair a person's judgment and ability to think. In addition, Newmark stated that Timmons's ability to think would also be affected by his significant volume loss, dehydration, the trace amounts of alcohol and valium in his blood, his significant pain, and insufficient fluids. Newmark also testified that it was inappropriate for the hospital to release Timmons to the police. Finally, Newmark testified that Dr. Peter Leung had conducted a mental status examination of Timmons at the hospital and had found that he was not cognitively impaired.

In an opinion dated June 2, 1999, the trial court granted Timmons's motion to suppress his first statement to Bardin mentioning "Cheeks" and "Lost Boys" because it was made prior to the administration of *Miranda* warnings. The court denied Timmons's motion to suppress the remainder of his statements to the police. The court held that Timmons, despite his medical condition, was able to make a knowing and voluntary decision to waive his rights to speak to the police. The court also held that Timmons's initial statement, taken prior to *Miranda* warnings, did not preclude admission of the later statements because the initial statement was not inculpatory. In addition, the court held that the warrantless entry into Timmons's apartment by the police was justified because of exigent circumstances, and that the evidence seized therein

was in plain view from inside the apartment. The court also denied Timmons's motion to suppress the physical evidence taken from him at the hospital on the ground that it was obtained incident to Timmons's lawful arrest.

b. *The Trial Court's* Molineux *Decision*

The trial court granted the People's *Molineux*[2] application in an opinion dated October 6, 1999, permitting them to elicit evidence of Timmons's prior crimes and bad acts against Anita and to introduce public documents from those incidents. The court ruled that evidence of Timmons's prior acts of assaulting Anita was admissible because it established Timmons's motive and intent to commit the crimes charged, was inextricably interwoven with the issue of Timmons's identity as the assailant in this case, provided the jury with background information to assist it in understanding the nature of Timmons's relationship with the victims, and established an element of the charge of aggravated criminal contempt.

The first *Molineux* witness, Mildred Stewart, Anita's mother and Aaron and Sharone's grandmother, testified to Anita's physical appearance after the incidents of domestic violence on July 1 and September 7, 1996. Police Officers Ann Marie Felle and Edward Sholl testified regarding their observations of Anita after they responded to her domestic violence-related calls, and Police Officer Richard Allison testified to his observations of Timmons after placing him under arrest for the August 9, 1996 assault of Anita. Sholl also testified regarding the appearance of Timmons's mother's house after the September 7, 1996 incident. Loretta LaPollo, the grand jury reporter who was present for the presentation of the indictment in the assault case (No. 3262/96) and for Anita's testimony before the grand jury, testified to the fact of Anita's having testified before the grand jury. The *Molineux* evidence also included Indictment

---

[2]     A *Molineux* hearing enables the court to decide if such acts may be offered by the People as affirmative proof of, for example, the defendant's intent or identity. *See People v. Molineux,* 168 N.Y. 264 (1901).

No. 3262/96 (in redacted form), Anita's hospital records in connection with the assaults (in redacted form),[3] the minutes of Timmons's plea of guilty to nine counts charged in Indictment No. 3262/96 (in redacted form), and certain prison records, which showed that Timmons was incarcerated for approximately nine months without release on the assault case. Corrections Officer George Gavin testified regarding the prison records and the length of Timmons's period of incarceration in the assault case. Iris Leviten, who transcribed the minutes of Timmons's trial and plea in that case, was asked by the People to read into evidence Timmons's plea allocution admitting guilt. The People also offered the protection order against Timmons.

           c.     *The Trial and the Sentencing*

The consolidated indictment in this case charged Timmons with six counts of first-degree murder under N.Y. Penal Law § 125.27(1)(a)(viii); six counts of second-degree murder, with three counts under N.Y. Penal Law § 125.25(1) and three counts under § 125.25(2); three counts of aggravated criminal contempt under N.Y. Penal Law § 215.52; and two counts of criminal possession of a weapon in the fourth degree under N.Y. Penal Law § 265.01(2). Of this list, the only charges submitted to the jury were three counts of first-degree murder, three counts of second-degree murder (under N.Y. Penal Law § 125.25(1)), and one count of aggravated criminal contempt.

Timmons represented himself at trial.[4] In addition to the witnesses mentioned above, the People elicited the testimony of Alexus Phoenix, the 911 operator who received the

---

[3]     Timmons's convictions in this other case – for two counts of assault in the second degree, unlawful imprisonment in the first degree, two counts of criminal possession of a weapon in the fourth degree, menacing in the second degree, two counts of assault in the third degree, and resisting arrest – were the subject of a separate petition for habeas relief. *See Timmons v. Lee et ano.*, 10-CV-2450 (JG). Oral arguments of the petitions were held at the same time, and the other petition was dismissed on September 17, 2010.

[4]     The history of Timmons's representation in the proceedings below is complicated. Timmons was represented by Gary Alexion and Robert Miller throughout the *Mapp/Huntley* hearings, though at some point prior to November 10, 1998, Timmons moved to proceed *pro se*. The trial court gave Timmons permission to ask his own questions of the *Mapp/Huntley* witnesses, but Mr. Alexion and Mr. Miller continued to represent Timmons for the

911 call on June 8, 1997; Sergeant Scott Andreacchi, one of the first officers to respond to the June 8 call of an assault in progress at Timmons's apartment; John Losinski, a Signal Processing Analyst for the FBI who had created a copy of the 911 tape with the movie soundtrack in the background removed; Pasquale Buffolino, a forensic scientist from the office of the New York City Medical Examiner who took and analyzed blood samples, clippings and swabs from the victims and the crime scene, and performed a DNA analysis of the blood samples; and Dr. Kari Reiber, who performed autopsies on Anita, Aaron and Sharone.  Timmons did not present any evidence at trial.

The jury convicted Timmons of all three counts of first-degree murder—naming Aaron as the intended victim and Sharone as the secondary victim, Aaron as the intended victim and Anita as the secondary victim, and Anita as the intended victim and Sharone as the secondary victim, respectively—and the count of aggravated criminal contempt.  On April 4, 2000, the trial court sentenced Timmons to three concurrent terms of life imprisonment without parole for the three first-degree murder convictions, and an indeterminate term of two and one-third to seven years' imprisonment for the contempt conviction.  The court also imposed a $5,000 fine for each of the four convictions, and a $155 mandatory surcharge.

2.      *The Motion To Vacate the Conviction*

On January 11, 2001, Timmons moved to vacate the judgment of conviction claiming that: (1) the prosecutor failed to disclose *Brady* and *Rosario* material in a timely manner; (2) the prosecutor disclosed forged documents; (3) testimony adduced at trial was known to be false by the prosecutor; (4) the indictment violated Timmons's due process rights

---

remainder of the hearing.  On April 13, 1999, Mr. Miller requested to be relieved as Timmons's counsel due to a conflict.  Timmons subsequently was represented by John Wallenstein, but at a status conference on September 14, 1999, Timmons moved to relieve Mr. Wallenstein and proceed *pro se*.  The court relieved Mr. Wallenstein and allowed Timmons to proceed *pro se* after determining that he was competent to do so.  At trial, Timmons represented himself with the assistance of Garnet Sullivan, his legal advisor.

because (a) the presentment to the grand jury was untimely, (b) a witness was not sworn prior to testifying before the grand jury, and (c) the prosecutor allowed misleading answers to be presented to the grand jury.  On May 11, 2001, Justice Hanophy denied Timmons's motion on the ground that all of the claims could be raised in Timmons's direct appeal, which had yet to be heard.  Timmons sought leave to appeal that order to the Appellate Division, which was denied on September 20, 2001.

       3.    *The Direct Appeal*

      On September 7, 2007, more than seven years after his sentencing, Timmons filed a *pro se* appellate brief with the Appellate Division.  He argued that: (1) the indictment violated his right not to be placed twice in jeopardy for the same crime; (2) the indictment was duplicitous; (3) there was insufficient evidence to convict Timmons; (4) the trial witnesses were not properly sworn; (5) the trial court erred in denying Timmons's motion to suppress his statements and the physical evidence recovered from his home; (6) the trial court erred in permitting the prosecutor to introduce evidence of Timmons's prior convictions; (7) Timmons's due process rights were violated when the trial court read a dismissed count to the jury; (8) the 911 tapes were improperly introduced into evidence; (9) the prosecutor withheld exculpatory evidence from Timmons in violation of *Brady* and *Rosario*; (10) the trial court exhibited bias against Timmons in violation of his due process rights; (11) the trial court erred when it denied his motion for a mistrial based upon juror misconduct; and (12) the habeas court should review the denial of Timmons's motion to vacate the judgment of conviction.

      On September 16, 2008, the Appellate Division affirmed Timmons's conviction. *People v. Timmons*, 864 N.Y.S.2d 111 (2d Dep't 2008).  The court held that: (1) the indictment was neither duplicitous nor multiplicitous and the same crime was not charged in more than one

of the counts; (2) the trial court properly denied Timmons's motion to suppress his statements to law enforcement and physical evidence; (3) the trial court properly allowed the prosecutor to present evidence of Timmons's prior bad acts and convictions; (4) Timmons's sufficiency claim was both unpreserved for appellate review and without merit; (5) Timmons's claim that his statements were obtained in violation of his right to counsel was unpreserved and in any event, could not be determined on the record; (6) the jury selection challenge was meritless; and (7) Timmons's remaining contentions were both unpreserved for appellate review and without merit.

Timmons filed a motion to reargue the appeal, which the Appellate Division denied on December 8, 2008. Timmons then sought leave to appeal from both that order and the decision affirming his conviction from the New York Court of Appeals. On April 3, 2009, a judge of the Court of Appeals dismissed the application for leave to appeal from the December order and denied the application for leave to appeal from the decision affirming the conviction. *People v. Timmons*, 12 N.Y.3d 822 (2009).

4. *The Instant Petition*

Timmons filed this petition on March 4, 2010, claiming that he is entitled to a writ of habeas corpus under 28 U.S.C. § 2254 on the following grounds: (1) the indictment violated the prohibition against double jeopardy; (2) the indictment was duplicitous; (3) there was insufficient evidence to convict him; (4) the witnesses were not properly sworn; (5) the trial court erred when it failed to suppress the physical evidence seized after the police entered his home without a warrant; (6) his statements to law enforcement were involuntary; (7) his statements to law enforcement were obtained in violation of his Sixth Amendment right to counsel; (8) the People improperly introduced evidence of Timmons's past crimes; (9) dismissed counts of the indictment improperly were read to the jury; (10) the 911 tapes introduced into

evidence were not properly authenticated; (11) the People withheld exculpatory evidence from

Timmons in violation of *Brady* and *Rosario*; (12) the trial court made biased statements against

Timmons in violation of his right to a fair trial; (13) the trial court erred when it denied

Timmons's motion for a mistrial based on jury tampering; and (14) the Court should review the

denial of Timmons's § 440 motion.[5]

DISCUSSION

A.      *Standards of Review*

As a preliminary matter, because Timmons is proceeding *pro se*, his submissions

must be "held to less stringent standards than formal pleadings drafted by lawyers."  *Hughes v.*

*Rowe*, 449 U.S. 5, 9 (1980) (quotation marks omitted).  In addition, the Court must read his

submissions "liberally and interpret them to raise the strongest arguments that they suggest."

*McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quotation marks omitted).

1.      *Exhaustion and Procedural Default*

28 U.S.C. § 2254(b) prevents a federal court from granting a petition for a writ of

habeas corpus unless the petitioner first has exhausted all available state judicial remedies.  In

order to have exhausted those remedies, a petitioner must have "fairly presented" his federal

constitutional claim to the state courts by apprising them of "both the factual and the legal

premises of the claim he asserts in federal court."  *Daye v. Attorney Gen.*, 696 F.2d 186, 191 (2d

Cir. 1982) (en banc).  An unexhausted claim that can no longer be exhausted is deemed

procedurally defaulted.  *See Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001) ("[W]hen 'the

petitioner failed to exhaust state remedies and the court to which the petitioner would be required

to present his claims in order to meet the exhaustion requirement would now find the claims

---

[5]      As part of his reply papers filed on August 16, 2010, Timmons served Respondents with
interrogatories and demands for documents dated May 11, 2010.  Docket Entry 15, Attachment 1.  The requests
Timmons makes in that submission are denied.

procedurally barred,' federal habeas courts also must deem the claims procedurally defaulted."
(quoting *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991))).  Furthermore, where there has
been actual and explicit reliance upon procedural default to dispose of a claim in state court,
there is an "adequate and independent state ground" for the judgment, prohibiting federal habeas
review.  *Harris v. Reed*, 489 U.S. 255, 261 (1989); *Galarza v. Keane*, 252 F.3d 630, 637 (2d Cir.
2001) (state court's reliance must be "unambiguous and clear from the face of the opinion");
*Levine v. Comm'r of Corr. Servs.*, 44 F.3d 121, 126 (2d Cir. 1995); *see also Coleman v.
Thompson*, 501 U.S. at 750 (noting the state's interests in "channeling the resolution of claims to
the most appropriate forum, in finality, and in having the opportunity to correct its own errors").
*But see Lee v. Kemna,* 534 U.S. 362, 376, 381 (2002) (noting the existence of a "small category"
of "exceptional cases in which exorbitant application of a generally sound rule renders the state
ground inadequate to stop consideration of a federal question").

   A claim that has been procedurally defaulted in state court generally cannot be
reviewed on the merits by a federal habeas court.  *See Harris v. Reed*, 489 U.S. at 260-62
(explaining rationale for habeas corpus procedural default rule); *see also Coleman*, 501 U.S. at
750.  However, there are two circumstances in which a federal claim that has been procedurally
defaulted—or deemed procedurally defaulted due to the exhaustion requirement—will
nonetheless be reviewable on a federal petition for habeas corpus.

   First, a petitioner is entitled to review of a procedurally defaulted claim if he can
show "cause for the default and actual prejudice as a result of the alleged violation of federal
law."  *Coleman*, 501 U.S. at 750; *Teague v. Lane*, 489 U.S. 288, 298 (1989).  A petitioner may
establish cause by showing "that the factual or legal basis for a claim was not reasonably
available to counsel, . . . or that some interference by officials . . . made compliance

impracticable." *Coleman*, 501 U.S. at 753 (quotation marks omitted) (citing *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). To show prejudice, a petitioner must demonstrate that the alleged error "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Torres v. Senkowski*, 316 F.3d 147, 152 (2d Cir. 2003) (quotation marks omitted).

Second, even if the petitioner is unable to show cause and prejudice, his procedural default may nonetheless be excused if he or she can show that a fundamental miscarriage of justice would result from a failure to hear the claim on the merits, i.e., "that he is actually innocent of the crime for which he has been convicted." *Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002) (citing *Schlup v. Delo*, 513 U.S. 298, 321 (1995)). This ground for excusing procedural default should be applied only in "extraordinary" cases, as courts deem substantial claims of actual innocence "extremely rare." *Schlup*, 513 U.S. at 321-22 (quotation marks omitted).

2.    *Review of State Court Adjudications on the Merits Under AEDPA*

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") narrowed the scope of federal habeas review of state convictions where the state court has adjudicated a petitioner's federal claim on the merits. 28 U.S.C. § 2254(d). Under the AEDPA standard, the reviewing court may grant habeas relief only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.*[6]

---

[6]    This limitation on relief is referred to as "AEDPA deference." *E.g.*, *Jimenez v. Walker*, 458 F.3d 130, 135 & n.2 (2d Cir. 2006).

The Supreme Court has interpreted the phrase "clearly established Federal law" to mean "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *see also Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001). A decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* "In other words, a federal court may grant relief when a state court has misapplied a 'governing legal principle' to 'a set of facts different from those of the case in which the principle was announced.'" *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003)).

Under the "unreasonable application" standard set forth in *Williams*, "'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.'" *Gilchrist*, 260 F.3d at 93 (quoting *Williams*, 529 U.S. at 411). Interpreting *Williams,* the Second Circuit has added that although "'[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.'" *Id.* at 93 (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)).

AEDPA's limited scope of review applies whenever a state court disposes of a state prisoner's federal claim on the merits and reduces its disposition to judgment, regardless of whether it refers to federal law in its decision. *See Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001).

In addition to the deference owed to state court determinations of fact under § 2254(d), subsection (e) requires that a federal habeas court presume all state court factual determinations to be correct. The petitioner has the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

B.      *Timmons's Claims*

1.      *The Double Jeopardy Claim*

The Double Jeopardy Clause provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The clause applies to the states through the Fourteenth Amendment. *Benton v. Maryland*, 395 U.S. 784, 787 (1969).

Timmons argues that his sentences violated this prohibition in that he was punished three times for a single criminal offense. At oral argument, he asserted that because his conduct could not be constitutionally divided up in this way, *all* of his murder convictions must be vacated.[7]

In New York, a defendant is guilty of murder in the first degree when, with the intent to cause the death of another person, he causes the death of that person or a third person, and one of several aggravating factors is present. N.Y. Penal Law § 125.27(1); *see also People*

---

[7]      Timmons focuses much of his argument on the indictment, which alleged six counts of first-degree murder. However, the only charges of relevance to his double jeopardy claim are the three counts that were submitted to the jury. Timmons cannot claim that he was punished in violation of the Double Jeopardy Clause with respect to counts that were dismissed at trial.

*v. Duggins*, 3 N.Y.3d 522, 529, 534 (2004). One such aggravating factor is present when, as part of the same criminal transaction, the defendant, acting with the intent to cause either serious physical injury to or death of an additional person or persons, causes the death of an additional person or persons. *Id.* § 125.27(1)(a)(viii); *see also id.* (providing that the victim cannot be a participant in the criminal transaction). Thus, each charge under the statute involves a primary victim whose death is the result of an intent to kill and an additional victim whose death as part of the same transaction is the result of either an intent to kill or an intent to cause serious physical injury or death.

The three counts of first-degree murder that were submitted to the jury, and of which Timmons was convicted, listed the following combinations of victims: in the first count, Aaron was the intended victim and Sharone was the secondary victim; in the second count, Aaron was the intended victim and Anita was the secondary victim; and in the third count, Anita was the intended victim and Sharone was the secondary victim. Thus, Aaron was the intended victim in two of the counts and Sharone was the secondary victim in two of the counts, but each count describes a unique combination of an intentional killing aggravated by an additional killing.

Timmons contends that because the indictment charged him with "multiple acts in overlapping succession when only one act occurred," it resulted in his being punished more than once for the same crime. In essence, he is challenging the first-degree murder charges as multiplicitous. *See, e.g.*, *United States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 1999) ("An indictment is multiplicitous when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed.") A multiplicitous indictment "violates the Double Jeopardy clause of the Fifth Amendment, subjecting a person to

punishment for the same crime more than once," *id.*, and also "may improperly prejudice a jury by suggesting that a defendant has committed not one but several crimes," *United States v. Reed,* 639 F.2d 896, 904 (2d Cir. 1981).

In passing on a double jeopardy claim of this type, the key inquiry is not whether the same conduct underlies the challenged counts; rather, it is "whether the 'offense'—in the legal sense, as defined by Congress—complained of in one count is the same as that charged in another." *Chacko*, 169 F.3d at 146. Accordingly, when the same statutory violation is charged twice, the critical question is "whether the facts underlying each count were intended by Congress to constitute separate 'units' of prosecution." *United States v. Ansaldi*, 372 F.3d 118, 124 (2d Cir. 2004) (quoting *Bell v. United States*, 349 U.S. 81, 83-84 (1955)).

Thus, in this context, the question is whether different permutations of primary and secondary victims in multiple-homicide cases were intended by the New York Legislature, in enacting Penal Law § 125.27, to constitute separate units of prosecution. That question is a matter of state law, and I take the explicit holding of the New York courts that "[t]he same crime was not charged in more than one of the counts," *People v. Timmons*, 864 N.Y.S.2d 111, 112 (2d Dep't 2008), as including a holding that a subsequent § 125.27 count that names the same primary victim as an earlier count but a different secondary victim was intended by the New York Legislature to constitute a separate unit of prosecution. I defer in the interest of federalism to that conclusion, and I defer as required by AEDPA to the further conclusion that multiple punishments for Timmons's first-degree murder convictions do not violate Double Jeopardy principles. Even if my review were *de novo*, I would agree with the state courts' decision. Since Timmons's conduct resulted in the murder of three people, his argument that he could only be convicted of one count of murder obviously rings hollow. Moreover, there is logic to the view

that a count charging the intentional murder of Aaron, which resulted also in the murder of Anita as part of the same criminal transaction, is not factually the "same offense" as a count charging the intentional murder of Aaron which resulted also in the murder of Sharone.

In any event, it is clear that the state courts' rejection of Timmons's multiplicity and double jeopardy claims was not contrary to, or an unreasonable application of, clearly established double jeopardy law as determined by the Supreme Court. That Court has not spoken on the double jeopardy consequences of units of prosecution such as those intended by § 125.27(1)(a)(viii), and in an absence of clearly established federal authority on the interaction between this type of first-degree murder statute and the Double Jeopardy Clause, the Appellate Division's decision that "[t]he same crime was not charged in more than one of the counts" in this case cannot be deemed objectively unreasonable. *See Price v. Vincent*, 538 U.S. 634, 642-43 (2003).[8]

2.    *The Claim that the Indictment Was Duplicitous*

Timmons contends that the indictment was duplicitous. This contention is in tension with the claim rejected above, i.e., that it was multiplicitous, but in any event the claim has no merit.

A "duplicitous" count in an indictment is one that charges more than one offense. *See* N.Y. Crim. Proc. Law § 200.30(1) ("Each count of an indictment may charge one offense only."). None of the counts of the indictment in this case was duplicitous. Implicit in

---

[8]    Respondents contend that any multiplicity error with respect to Timmons's three first-degree murder convictions was remedied by the fact that Timmons's sentences on those convictions were concurrent. *See United States v. Vargas*, 615 F.2d 952, 959-60 (2d Cir. 1980) (setting forth five factors identifying various collateral consequences that could result from affirming a conviction on the basis of the "concurrent sentence" doctrine, and stating that a court should examine whether any of at least those five factors is present before invoking the doctrine). I disagree. The imposition of a $5,000 fine on each of the three murder counts precludes the application of the doctrine. *See Ray v. United States*, 481 U.S. 736, 737 (1987) (per curiam) (holding that, because the defendant's liability to pay the three $50 assessments imposed on each count of which he was convicted, totaling $150, depended on the validity of each of his three convictions, the defendant's sentences were not concurrent and the concurrent sentence doctrine was inapplicable).

Timmons's duplicity argument, however, is the constitutional claim that the "multiple theoried indictment" violated his Sixth Amendment right to be informed of the nature and cause of the accusation against him. U.S. CONST. amend. VI. Though the indictment charged Timmons with several counts of first-degree murder and second-degree murder based on his acts on June 8, 1997, Timmons had fair notice of what the People would attempt to prove at trial: that he caused the death of all three of the victims under circumstances amounting either to first-degree murder, second-degree intentional murder, or second-degree depraved indifference murder. Each count contained factual allegations supporting each element of the murder charge in question, and the indictment as a whole contained sufficient information to enable Timmons to prepare his defense and to plead the judgment as a bar to further proceedings. *United States v. Spada*, 331 F.2d 995, 996 (2d Cir. 1964); *see also United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) (citing *Russell v. United States*, 369 U.S. 749, 763-64 (1962)). Accordingly, Timmons's duplicity claim is wholly without merit.

       3.      *The Sufficiency of the Evidence*

      A state prisoner is entitled to habeas relief if "it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *see also id.* at 319 ("[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.").

      Timmons argues that the People failed to prove motive, identity, intent, the fact that he was over the age of 18 at the time of the crimes' commission, and his possession of a

weapon, and points to the People's failure to produce the murder weapon(s).[9]  The People were only required to prove that Timmons caused the death of the primary victim listed in each count; that he acted with the intent to cause the death of that victim; that under each count, he caused the death of the secondary victim during the same criminal transaction; that neither of the victims listed in each count was a participant in the criminal action; and that Timmons was more than 18 years old at the time of the commission of the crimes.

There was ample evidence adduced at trial upon which a rational juror could find these elements proven beyond a reasonable doubt for all three counts of first-degree murder. When the responding officers arrived at and forced entry into Timmons's locked apartment, they found him alive amidst unspeakable carnage: his stepson Sharone's dead body was at his feet and his wife Anita's and son Aaron's dead bodies were strewn throughout the blood-covered apartment.  There was no one else present in the apartment and no other means of entry or exit besides the locked front door.  There was no trace of blood on the exterior of the front door or in the hallway outside the apartment.  Timmons had self-inflicted wounds on his left wrist and eventually admitted to killing his wife, acknowledging as well that he must have killed Aaron and Sharone because he was the only person in the apartment.  The blood samples recovered from the apartment all derived from either Timmons or one of the three victims.  In addition, the People offered the 911 tape recorded during the murders, on which could be heard the voices of Timmons and the three victims, as identified by Anita's mother, Mildred Steward, with Sharone yelling, "Daddy, stop," Anita and Timmons screaming, and Aaron saying, "Mommy, Mommy."

Based on this evidence, a rational juror could conclude beyond a reasonable doubt that Timmons caused the deaths of Anita, Aaron and Sharone, and that with respect to Aaron and

---

[9]  To the extent Timmons's sufficiency claim raises separate issues, e.g., regarding the admission of *Molineux* evidence, the jury charge, the involuntariness of Timmons's incriminating statements, etc., those issues will be addressed in turn below.

Anita, he acted with the intent to cause their deaths.  The number of wounds inflicted on the victims, the manner in which they were killed, the nature of the crime scene and Timmons's presence there, along with Timmons's self-inflicted wound and admissions, were powerful circumstantial evidence of Timmons's intent to kill the victims.  The same evidence supports a finding that, as part of the same criminal transaction in which he killed the primary victim in each count, Timmons killed the secondary victim in that count.  The voices on the 911 tape and the condition in which the victims were found proved that they were not participants in each other's murders.  Although Timmons claims that the People failed to prove that he possessed the intent to kill Aaron, a rational juror could have found that element proven beyond a reasonable doubt in light of Timmons's admissions and on the theory that Timmons did not want to leave any witnesses of his crimes alive.  In addition, despite Timmons's claim that the People were required to prove the order in which the three victims were murdered, the People were under no such obligation.  Sufficient evidence was adduced to permit a reasonable juror to find beyond a reasonable doubt that Timmons had committed the three charged counts of first-degree murder.

Finally, the fact that Timmons was over 18 years of age on the date of the crimes' commission was established by the date of birth (6/4/1964) Timmons provided to Detective Ledee, which Ledee wrote on the paperwork that the People offered as Exhibit 71 and about which Ledee testified.  Accordingly, I conclude that sufficient evidence was introduced at trial to permit a rational juror to conclude beyond a reasonable doubt that Timmons committed the first-degree murders of which he was convicted.[10]

---

[10]     Because I find that the claim has no merit, I do not need to address what appears to be a persuasive argument that this claim was procedurally defaulted.

4.      *The Oath Given to the Witnesses at Trial*

Timmons also claims that the witnesses at trial were not sworn before they testified.  The transcript reflects the opposite, noting that each witness was "duly sworn" by the Clerk of the Court.  Moreover, there is no requirement in federal law that the oath administered to trial witnesses be transcribed verbatim in the record.  Timmons's argument to that effect is unavailing.[11]

5.      *The Warrantless Entry into Timmons's Apartment and the Seizure of Physical Evidence*

Timmons argues that the trial court erred when it failed to suppress the physical evidence recovered as a result of the police's entry into his home.  At the suppression hearing, Timmons argued that the police entered his home without a warrant in violation of the Fourth Amendment.  The trial court held, however, that exigent circumstances justified the police's warrantless entry into Timmons's apartment.

"As a general rule, Fourth Amendment claims are not reviewable by the federal courts when raised in a petition brought under § 2254 unless the state prisoner shows that he or she has not had a full and fair opportunity to litigate that claim in the state court."  *Graham v. Costello*, 299 F.3d 129, 133-34 (2d Cir. 2002) (citing *Stone v. Powell*, 428 U.S. 465, 481-82 (1976)).  Here, Timmons moved before trial to suppress the physical evidence recovered by law enforcement and the trial court held a suppression hearing.  At the close of the hearing, Timmons argued that the police officers' entry into his home was improper, that the officers lacked probable cause to arrest him, and that all physical evidence seized by the officers from his apartment and Elmhurst Hospital on June 9, 1997 should be suppressed.  The trial court denied Timmons's motion on June 2, 1999 in a written opinion.  Timmons then challenged the search on

---

[11]      Again, I do not need to address the procedural default argument with respect to this claim.

direct appeal and the Appellate Division held that the trial court properly had denied Timmons's

motion to suppress the physical evidence.  I therefore find that the state courts provided

Timmons with a full and fair opportunity to litigate his Fourth Amendment claims.  The

proceedings below also pass muster under the test enunciated in *Capellan v. Riley*, 975 F.2d 67

(2d Cir. 1992), in that the New York courts provided an adequate corrective procedure to redress

Timmons's Fourth Amendment claim, *id.* at 70 n.1 (noting that the federal courts have approved

New York's procedure for litigating Fourth Amendment claims), and no unconscionable

breakdown occurred in the existing process, *id.* at 70.  Accordingly, Timmons's Fourth

Amendment claim is not reviewable in this federal habeas proceeding.

      6.     *Timmons's Statements to the Police*

Timmons also claims that his statements to Detectives Bardin, Mecabe, Sica and

Ledee were involuntary and that their admission at trial violated the Due Process Clause of the

Fourteenth Amendment.  U.S. Const. amend. XIV.

The Supreme Court has recognized that "*any* criminal trial use against a defendant

of his *involuntary* statement is a denial of due process of law."  *United States v. Kaba*, 999 F.2d

47, 50 (2d Cir. 1993) (quotation marks and alteration omitted) (emphases in original); *see also*

*Arizona v. Fulminante*, 499 U.S. 279, 295 (1991) (White, J., dissenting) (explaining the

prohibition against using a defendant's coerced confession against him at his criminal trial).  In

evaluating whether a statement was voluntary, "we look at the totality of the circumstances in

which [it was] given to determine whether the government agents' conduct was such as to

overbear a defendant's will to resist and bring about confessions not freely self-determined."

*Kaba*, 999 F.2d at 51 (quotation marks and brackets omitted).

Timmons moved to suppress his statements to Bardin about what had happened to his family and his verbal and written confessions to Mecabe, Sica and Ledee. The trial court found that the statements admitted at trial were voluntarily made after Timmons waived his *Miranda* rights. On federal habeas review, I must presume these factual findings as to the voluntariness of Timmons's statements to be correct. *See* 28 U.S.C. § 2254(e)(1). In order to prevail, Timmons must rebut this presumption of correctness with clear and convincing evidence.[12] Timmons has not presented evidence or information sufficient to rebut the presumption, and thus his due process claim regarding the admission of his statements at trial must fail.

7.    *Timmons's Right to Counsel Claim*

As an additional argument regarding his statements to the detectives, Timmons claims that he was represented by counsel when the detectives questioned him on June 9, 1997, that the defendants were aware of this fact when they questioned him, and that the statements he made to them without his counsel present were therefore obtained in violation of his rights under the Sixth and Fourteenth Amendments. Timmons does not explain who his counsel was or the subject matter of the representation, but he is obviously referring to his counsel in the assault prosecution, which overlapped with the events at issue in this case.

Once the right to counsel has attached, it is violated when a confession is deliberately elicited by law enforcement in the absence of counsel or a proper waiver. *See Brewer v. Williams*, 430 U.S. 387, 398 (1977) (describing the "right to counsel granted by the

---

[12]    The Supreme Court has not yet spoken on the precise relationship between AEDPA's two provisions requiring deference to state courts' findings of fact, i.e., 28 U.S.C. § 2254(d)(2) and (e)(1). *See Wood v. Allen*, 130 S. Ct. 841, 848-49 (2010). Specifically, the Court has not determined "whether the arguably more deferential standard set out in § 2254(e)(1) applies in every case presenting a challenge under § 2254(d)(2)." *Id.* at 849. In my view, § 2254(e)(1) applies where, as here, the state court conducts an evidentiary hearing and makes findings of fact on the disputed issues of fact. However, because I also conclude that the state court's findings about the voluntariness of Timmons's statements were not unreasonable, I would reject Timmons's argument under either standard of review.

Sixth and Fourteenth Amendments"); *Massiah v. United States*, 377 U.S. 201, 206 (1964). However, the Sixth Amendment right is "offense specific," meaning that a defendant to whom the right to counsel has attached for one offense may be questioned about other criminal conduct for which the right has not yet attached. *See McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991). As a result, irrespective of what the detectives knew or did not know about Timmons's having counsel in connection with his assault prosecution, there was no constitutional violation in their questioning him about the instant offenses in the absence of counsel. I therefore reject Timmons's right to counsel claim.[13]

8.    *Evidence of Timmons's Past Crimes*

Timmons challenges the trial court's decision to admit evidence of his prior crimes, and argues that the admission of such evidence violated his federal due process rights.

As a preliminary matter, I reject Respondents' argument that this claim raises exclusively state law issues. The claim is predicated on the trial court's decision to admit evidence under a *Molineux* exception, *see People v. Molineux*, 168 N.Y. 264 (1901), but evidentiary rulings can implicate federal constitutional rights when, for example, they deprive a defendant of a fair trial. The Due Process Clause of the Fourteenth Amendment is violated when a trial court erroneously admits evidence that "was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir. 1992) (quotation marks omitted). This test for due process violations has been held to apply post-AEDPA. *See Wade v. Mantello*, 333 F.3d 51, 59 (2d Cir. 2003).

---

[13]    I do not need to address what again appears to be a persuasive argument that this claim was procedurally defaulted because I find that the claim has no merit.

I find that no constitutional violation arose from the trial court's admission of the testimony of Respondents' *Molineux* witnesses and the documentation from Timmons's prior assault case and other incidents of domestic violence, on which the court gave proper limiting instructions. The Appellate Division held that the *Molineux* evidence was introduced for the permissible purposes of establishing Timmons's motive, providing relevant background information to assist the jury in understanding his relationship with his wife, and explaining why an order of protection had been issued against him. *See People v. Timmons*, 54 A.D.3d at 885. That holding was not an unreasonable application of federal law; indeed, I agree with it entirely.[14]

9.     *Dismissed Counts of the Indictment Were Read to the Jury*

Timmons argues that he suffered a violation of his constitutional rights when the trial court read to the jury counts of the indictment that subsequently were dismissed before summations. There is no merit to this claim. On April 9, 1998, the trial court granted the People's motion to consolidate Indictment No. 2220/97, the original indictment charging Timmons with two counts of first-degree murder, six counts of second-degree murder, three counts of aggravated criminal contempt, and two counts of criminal possession of a weapon in the fourth degree, and Indictment No. 3964/97, which charged Timmons with four additional counts of first-degree murder. The court based its order consolidating the indictments on its finding that the crimes arose out of the same criminal transaction and therefore were properly joinable. The court also found that the murder counts were not multiplicitous. Prior to summations, the People moved to dismiss three of the six counts of first-degree murder, in order to reduce the burden on the jury. Subsequently, in the court's final charge to the jury, the court

_____

[14]     Timmons also contends that he was prejudiced in violation of his constitutional rights when a count from the former indictment improperly was read to the jury during Iris Leviten's publication of Timmons's plea minutes. I find, as did the state courts below, that there is no merit to this claim.

explained that the jury was not to speculate as to or consider as part of their deliberations why there were fewer counts being submitted to them than originally were read to them, and noted that this reduction in counts had a legal basis. The court's actions with respect to the indictment were proper and did not violate Timmons's constitutional rights.

10.    *The Authentication of the 911 Tapes*

Timmons argues that the 911 tapes introduced into evidence were not properly authenticated and should not have been received as evidence at trial. The tape of the 911 call, however, was authenticated by Alexus Phoenix, the 911 operator who took the call that night, and was properly admitted as a present sense impression of Mr. Phoenix. The tape without the movie playing in the background was authenticated as well; the testimony of John Losinski, the FBI analyst who had created that tape by subtracting the soundtrack of a movie playing in the background from a copy of the original tape and had marked the tape with his initials, sufficed to authenticate the tape. To the extent Timmons raises other issues with regard to the chain of custody of the tapes, the employment of Losinski at the FBI, and the marking system used to identify the tapes, none of these arguments suggests that Timmons's federal due process rights were violated by the admission of the tapes into evidence. Moreover, Timmons's claim that his rights under the New York Constitution were violated as a result of the court's handling and admission of these tapes is not cognizable on federal habeas review, and his suggestions that the court was required to seal the tapes or call an expert to authenticate the tapes and identify the voices on them are baseless. I accordingly reject this claim as well.[15]

---

[15]    Again, I do not need to address the additional argument that this claim was procedurally defaulted.

11.     *The People's Failure To Disclose Evidence*

Timmons claims that the People withheld exculpatory material from him in violation of his constitutional rights under *Brady v. Maryland*, 373 U.S. 83 (1963) and *People v. Rosario*, 9 N.Y.2d 286 (1961) (providing a rule, under New York law, for when pretrial statements of a government witness must be handed over to the defendant).

*Brady* provides that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." 373 U.S. at 87. The evidence that Timmons claims was kept from him includes the 911 tapes, memo books of the various detectives, Polaroid photographs of the crime scene and Timmons in the hospital, and fingerprint analysis from the crime scene. However, statements by the prosecutor at the *Mapp/Huntley* hearing on October 28, 1998, along with eight letters exchanged between counsel (dated April 7, 1998, June 17, 1998, January 14, 1999, January 20, 1999, February 3, 1999, March 11, 1999, March 24, 1999, and March 3, 2000, respectively), reflect that any evidence falling into the categories described above was shared with Timmons before trial. While Timmons speculates that the memo books contained notes by the detectives that would have been material to his defense, this allegation finds no support in the record. I therefore reject Timmons's *Brady* claim as unsupported by the record, and accordingly find that the Appellate Division's conclusion that this claim was without merit was not an unreasonable application of federal law.

12.     *The Trial Court's Statements*

Timmons also contends that the trial court displayed bias against him throughout the trial and made partial rulings in favor of the People, which together deprived him of a fair trial. This bias claim is in essence a potpourri of residual claims of trial error, none of which I

am persuaded has merit.  The nine[16] challenged statements or rulings made by the trial court did

not, on their own or in combination, evince judicial bias against Timmons, let alone impress the

jury with the judge's partiality to the People "to the point that this became a factor in the

determination of the jury."  *United States v. Salemeh*, 152 F.3d 88, 128 (2d Cir. 1998) (quotation

marks omitted).  As Timmons has made out no constitutional violation with respect to the trial

court's statements and rulings, I have no trouble endorsing the Appellate Division's rejection of

this claim as meritless.

13.    *Jury Tampering*

Timmons claims that during jury selection, someone asked aloud in the hallway

outside the courtroom "why a person might do what is alleged," and that this comment amounted

to jury tampering necessitating a mistrial.  The record reveals that once one of the sworn jurors

mentioned the comment to the court and stated that there had been speculation in the hallway on

the topic, the court subsequently questioned each panel of prospective jurors and determined that

none had participated in or overheard the conversation.  After having investigated the matter and

concluded that neither the sworn jurors nor prospective jurors had been tainted by the comment

and ensuing conversation, the trial court denied Timmons's mistrial motion.  The trial court acted

conscientiously in investigating the comment in this manner, and its conclusion that the

impartiality of the sworn and prospective jurors had not been compromised by the comment and

ensuing conversation is entitled to deference.  *See Patton v. Yount*, 467 U.S. 1025, 1038 (1984)

(stating that a trial court's resolution of questions regarding juror impartiality is entitled to no

less than "special deference" on habeas review).   I therefore find, like the Appellate Division,

that the jury tampering claim has no merit.

---

[16]    I do not need to address the persuasive argument that six of the nine subparts of this claim were procedurally defaulted because I find that none of the claim's subparts has merit.

14.     *Timmons's Motion To Vacate His Conviction*

Lastly, Timmons challenges the state courts' denial of his motion to vacate his conviction.  As recited above, the trial court denied Timmons's motion pursuant to N.Y. Crim. Proc. L. § 440.10(2)(b) because sufficient facts appeared on the record with respect to Timmons's claims to permit their adequate review on direct appeal.  The Appellate Division denied Timmons's subsequent motion for leave to appeal this decision.  Respondents argue that the claims raised in Timmons's 440 motion were procedurally defaulted because the trial court relied on the adequate and independent state ground of Timmons's having violated state procedural rules in bringing the motion, and therefore that habeas review of those claims is foreclosed.  I agree.  Timmons raised his *Brady*/*Rosario* claim on direct appeal and therefore exhausted that claim, but, for some reason, chose not to raise the other three claims from his 440 motion on appeal.[17]  He has failed to establish cause for or prejudice from his procedural default on these claims, and has not demonstrated that a fundamental miscarriage of justice will result if these claims are not reviewed in this habeas proceeding.  *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  For these reasons, I decline to review the claims in Timmons's 440 motion.[18]

---

[17]     These claims were as follows: the People disclosed forged documents to Timmons; testimony adduced at trial was knowingly perjured; and the indictment violated Timmons's due process rights because the grand jury presentment was untimely, a witness that testified before the grand jury was not properly sworn, and the People permitted misleading answers to be presented to the grand jury.  Some of these claims resemble the claims Timmons raises in the instant petition, and all appear to be meritless.

[18]     As for the remaining claims Timmons makes in his habeas petition, I have reviewed those claims and find them all to be without merit.

## CONCLUSION

For the foregoing reasons, the petition is denied. As Timmons has failed to make a substantial showing that he was denied a constitutional right, no certificate of appealability shall issue.

So Ordered.

John Gleeson, U.S.D.J.


Date:   September 23, 2010
        Brooklyn, New York